UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| DIJANA V., | **MEMORANDUM DECISION AND ORDER AFFIRMING THE COMMISSIONER'S DECISION DENYING DISABILITY BENEFITS** |
| Plaintiff, | |
| v. | |
| LELAND DUDEK, Acting Commissioner of the Social Security Administration, | Case No. 2:24-cv-00204 |
| Defendant. | Magistrate Judge Daphne A. Oberg |

Plaintiff Dijana V.[1] brought this action for judicial review of the denial of her

application for disability insurance benefits by the Commissioner of the Social Security

Administration.[2]  The Administrative Law Judge ("ALJ") who addressed Ms. V.'s

application determined she did not qualify as disabled.[3]  Ms. V. argues the ALJ erred in

evaluating Ms. V.'s history of strokes, fibromyalgia, exertional limitations, and the

medical opinion evidence.[4]  Because the ALJ applied the correct legal standards and

her findings are supported by substantial evidence, the Commissioner's decision is

affirmed.[5]

---

[1] Pursuant to best practices in the District of Utah addressing privacy concerns in judicial opinions in certain cases, including social security cases, the plaintiff is referred to by first name and last initial only.

[2] (*See* Compl., Doc. No. 2.)

[3] (Certified Tr. of Admin. R. ("Tr.") 992–1020, Doc. No. 9.)

[4] (*See* Opening Br., Doc. No. 19.)

[5] The parties consented to proceed before a magistrate judge in accordance with 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  (Doc. No. 7.)

## STANDARD OF REVIEW

Section 405(g) of Title 42 of the United States Code provides for judicial review of the Commissioner's final decision.  This court reviews the ALJ's decision to determine whether substantial evidence supports her factual findings and whether she applied the correct legal standards.[6]  "[F]ailure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal."[7]

An ALJ's factual findings are "conclusive if supported by substantial evidence."[8]  Although the threshold for substantial evidence is "not high," it is "more than a mere scintilla."[9]  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[10]  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence."[11]  And the court may not reweigh the evidence or substitute its judgment for that of the ALJ.[12]

---

[6] See 42 U.S.C. § 405(g); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

[7] *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005).

[8] *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (internal quotation marks omitted).

[9] *Id.* at 103 (citation omitted).

[10] *Id.* (citation omitted).

[11] *Lax*, 489 F.3d at 1084 (citation omitted).

[12] *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004).

**APPLICABLE LAW**

The Social Security Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" expected to result in death or last for at least twelve consecutive months.[13] An individual is considered disabled only if her impairments are so severe, she cannot perform her past work or "any other kind of substantial gainful work."[14]

In determining whether a claimant qualifies as disabled, the ALJ uses a five-step sequential evaluation, considering whether:

1) the claimant is engaged in substantial gainful activity;

2) she has a severe medically determinable physical or mental impairment;

3) the impairment is equivalent to an impairment precluding substantial gainful activity (listed in the appendix of the relevant disability regulation);

4) she has the residual functional capacity to perform past relevant work; and

5) she has the residual functional capacity to perform other work, considering her age, education, and work experience.[15]

---

[13] 42 U.S.C. § 423(d)(1)(A).

[14] *Id.* § 423(d)(2)(A).

[15] *See* 20 C.F.R. § 404.1520(a)(4); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Williams v. Bowen*, 844 F.2d 748, 750–51 (10th Cir. 1988).

In the first four steps, the claimant has the burden of establishing disability.[16]  At step

five, the Commissioner must show the claimant retains the ability to perform other work

in the national economy.[17]

## PROCEDURAL HISTORY

Ms. V. applied for disability insurance benefits,[18] alleging she became disabled

on June 24, 2017.[19]  The ALJ held an administrative hearing and issued a decision in

April 2020, denying benefits.[20]  Ms. V. appealed the denial to the district court, and the

court granted the Commissioner's unopposed motion to remand the case for further

proceedings.[21]  On remand, the ALJ held a second hearing and issued a new decision

in October 2023, again denying benefits.[22]  This decision became the Commissioner's

final decision when the Appeals Council denied Ms. V.'s request for review.[23]

In the October 2023 decision, at step two of the sequential evaluation, the ALJ

found Ms. V. had the severe impairments of degenerative disc disease of the cervical

and lumbar spine and obesity from June 24, 2017 (her alleged onset date) through

---

[16] *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989).

[17] *Id.*

[18] *See* 42 U.S.C. §§ 401–434.

[19] (*See* Tr. 88, 992.)

[20] (Tr. 88–103.)

[21] *See* Order Granting Def.'s Unopposed Mot. to Remand for Further Admin. Proc. Under Sentence Four of 42 U.S.C. § 405(g), *Dijana V. v. Kijakazi*, No. 2:21-cv-00538 (D. Utah July 14, 2022), Doc. No. 25.

[22] (Tr. 992–1020.)

[23] (Tr. 983–85.)

December 31, 2019 (her last insured date).[24]  The ALJ concluded that from December 4, 2018 through her last insured date, Ms. V. also had the severe impairments of major depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder ("PTSD").[25]  The ALJ determined Ms. V. had nonsevere impairments including gastroesophageal reflux disease, hernia, anal fistula, diverticulitis/diverticulosis, hypertension, and hypothyroidism.[26]  However, the ALJ decided Ms. V.'s alleged impairments of "history of stroke or [cerebral vascular accident ("CVA")], vertigo, blindness, ulcer, osteoarthritis/bursitis, [and] fibromyalgia" were not medically determinable.[27]  At step three, the ALJ found Ms. V.'s impairments did not meet or medically equal an impairment listing.[28]

The ALJ then determined Ms. V. had the residual functional capacity to perform "light work" throughout the relevant period, "including the ability to lift and/or carry 10 pounds frequently and 20 pounds occasionally"; "frequently stoop, kneel, crouch, and crawl"; and "frequently climb ramps and stairs, but never climb ladders, ropes, or scaffolds."[29]  The ALJ decided Ms. V.'s residual functional capacity included additional mental limitations beginning on December 4, 2018.[30]  At step four, based on this

---

[24] (Tr. 995.)

[25] (*Id.*)

[26] (*Id.*)

[27] (Tr. 996–97.)

[28] (Tr. 997–1000.)

[29] (Tr. 1000.)

[30] (*Id.*)

residual functional capacity and the testimony of a vocational expert, the ALJ concluded Ms. V. could perform past work as a pharmacy technician, catheter builder, and loan specialist through December 3, 2018—but could not perform any past work after that date.[31]  Nevertheless, at step five, the ALJ found Ms. V. capable of performing other jobs for the entire relevant period, including merchandise marker, cleaner/housekeeper, and cafeteria attendant.[32]  Therefore, the ALJ found Ms. V. not disabled during the relevant period (June 24, 2017 through December 31, 2019) and denied her claim.[33]

## ANALYSIS

Ms. V. asserts the ALJ erred in finding her history of strokes and fibromyalgia were not medically determinable.[34]  Ms. V. also argues the ALJ erred in her residual functional capacity assessment—specifically, in her evaluation of medical opinions, consultative examination findings, and Ms. V.'s exertional limitations.[35]  As explained below, Ms. V. fails to demonstrate any error by the ALJ.

A.  Non-medically Determinable Impairments

To be medically determinable, an impairment "must be established by objective medical evidence from an acceptable medical source."[36]  Agency regulations define

---

[31] (Tr. 1017–18.)

[32] (Tr. 1018–19.)

[33] (Tr. 1019–20.)

[34] (See Opening Br. 19–26, Doc. No. 19.)

[35] (*See id.* at 9–17, 28–31.)

[36] 20 C.F.R. § 404.1521.

"objective medical evidence" as "medical signs, laboratory findings, or both."[37]  As explained below, the ALJ found Ms. V.'s history of strokes and fibromyalgia were not established by objective medical evidence from an acceptable medical source, and the ALJ's findings are supported by substantial evidence.

1.  *History of Strokes*

Ms. V. reported a history of two strokes: one in 2014 (before her alleged disability onset date) and the other several months before her April 2018 consultative exam.[38] But the ALJ observed there were "no actual records of her having a stroke, or even a lesser cerebral vascular accident (CVA)."[39]  As the ALJ noted, an MRI of Ms. V.'s brain from May 2017 "showed no evidence of prior infarct and was normal."[40]  Likewise, an April 2019 MRI showed "no evidence of prior brain infarct," and a June 2020 MRI showed "stable findings."[41]  The ALJ noted none of these MRI results indicated Ms. V. had experienced a stroke.[42]  The ALJ also observed there was "no evidence from 2017 or 2018 that [Ms. V.] sought treatment for stroke symptoms, despite her allegation in April 2018 that she experienced a stroke several months prior."[43]  Based on the lack of

---

[37] *Id.* § 404.1513(a)(1).

[38] (*See* Tr. 996 (ALJ's summary of Ms. V.'s reported history of strokes); Tr. 603 (consultative examiner's April 2018 report stating Ms. V. reported she had a stroke in 2014 and a second stroke "several months ago").)

[39] (Tr. 996.)

[40] (*Id.* (citing Tr. 484).)

[41] (*Id.* (citing Tr. 1637–38, 1686).)

[42] (*Id.*)

[43] (*Id.*)

supporting medical evidence, the ALJ found Ms. V.'s history of strokes was not medically determinable.[44]

Ms. V. fails to identify "objective medical evidence from an acceptable medical source" in the record supporting a contrary finding.[45]  Ms. V. cites the MRI results from May 2017 and June 2020,[46] but the ALJ accurately noted these results were normal. Ms. V. fails to explain how they support her allegation regarding a history of strokes. Ms. V. also cites various other medical records referencing her reported stroke history or related symptoms,[47] but none constitute objective medical evidence (medical signs or laboratory findings) confirming she experienced a stroke.[48]  For example, Ms. V. cites a May 2017 treatment record stating Ms. V. was requesting an MRI "to make sure there is no evidence . . . of stroke" after experiencing lightheadedness and numbness.[49] However, as the ALJ noted, MRI results from the same day were normal.[50]  A medical record describing Ms. V.'s self-reported symptoms, immediately followed by a normal

---

[44] (Tr. 996–97.)

[45] *See* 20 C.F.R. § 404.1521.

[46] (*See* Opening Br. 23, Doc. No. 19 (citing Tr. 47, 484).)  Ms. V. cites a "progress note" describing findings from the June 2020 MRI, which was submitted to the Appeals Council after the ALJ's first decision denying benefits, (*see* Tr. 47).  It is unclear whether this was part of the record considered by the ALJ in her second decision.  But the ALJ considered a separate "final report" from the same MRI, (Tr. 1637), and both records indicate the MRI results were normal.  (*See* Tr. 47, 1637.)

[47] (*See* Opening Br. 20, 22, Doc. No. 19 (citing Tr. 169, 462, 537, 606, 1404).)

[48] *See* 20 C.F.R. § 404.1513(a)(1) (defining "objective medical evidence" as "medical signs, laboratory findings, or both").

[49] (Tr. 462.)

[50] (Tr. 484.)

MRI result, is insufficient to establish a medically-determinable impairment.[51]  Likewise, the various records mentioning the 2014 stroke as part of Ms. V.'s medical history are insufficient, where there is no objective medical evidence of a 2014 stroke in the record.[52]

Ms. V. also relies on evidence outside the administrative record, which she filed as an attachment to her opening brief.[53]  This attachment contains hospital records from 2014 which Ms. V. contends support her allegations regarding the 2014 stroke.[54]  But this court's review is limited to the administrative record, and the court may not remand for consideration of new evidence unless a claimant shows good cause for her failure to present the evidence at the administrative level.[55]  Ms. V. asserts she submitted this evidence to the Appeals Council on February 8, 2024, five days before the Appeals Council denied her request for review of the ALJ's decision.[56]  But Ms. V. provides no

---

[51] *See* 20 C.F.R. § 1521 ("We will not use your statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment[].").

[52] (*See* Tr. 169, 462, 537, 606.)

[53] (*See* Doc. No. 20.)  Ms. V. refers to this evidence as "Attachment A" in her opening brief.  (*See* Opening Br. 2, 22, 27, Doc. No. 19.)

[54] (*See* Opening Br. 21–22, Doc. No. 19 (quoting "Attachment A," Doc. No. 20 at 18–19).)

[55] *See* 42 U.S.C. § 405(g) (providing a district court may "enter, *upon the pleadings and transcript of the [administrative] record*, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing" (emphasis added)); *Morgan v. Astrue*, 302 F. App'x 786, 788 (10th Cir. 2008) (unpublished) (finding a district court did not err in declining to consider new evidence where the claimant did not "assert that there was good cause, or any cause, for the apparent failure to present the records at the administrative level").

[56] (*See* Opening Br. 2, Doc. No. 19; *see also* Tr. 983–85.)

evidence supporting her assertion that she submitted these documents to the Appeals Council, and the administrative record contains no indication that the Appeals Council received or considered them.  Ms. V. also fails to make any argument as to why this court should consider this evidence.  In other words, she has not shown she presented this evidence at the administrative level or that good cause exists for her failure to do so.  Accordingly, this evidence is not considered.

Because Ms. V. fails to identify objective medical evidence in the record supporting her alleged stroke history, the ALJ did not err in finding her stroke history was not a medically determinable impairment.

### 2. Fibromyalgia

Ms. V. next contends the ALJ erred in finding her fibromyalgia was not a medically determinable impairment.

Social Security Ruling ("SSR") 12-2p dictates that only a "licensed physician (a medical or osteopathic doctor)" qualifies as an acceptable medical source for purposes of establishing fibromyalgia as a medically determinable impairment.[57]  The physician must provide a diagnosis of fibromyalgia and evidence showing the claimant meets one of two sets of criteria: the 1990 American College of Rheumatology ("ACR") Criteria for the Classification of Fibromyalgia or the 2010 ACR Preliminary Diagnostic Criteria.[58] The record must also show the physician "reviewed the person's medical history and

---

[57] SSR 12-2p, 2012 SSR LEXIS 1, at *3 (July 25, 2012).

[58] *Id.* at *3–4.

conducted a physical exam."[59]  Finally, the physician's diagnosis must not be "inconsistent with the other evidence in the person's case record."[60]

Ms. V. was diagnosed with fibromyalgia by her treating provider Michelle Dahle, a family nurse practitioner.[61]  The ALJ noted Ms. Dahle was not an acceptable medical source for purposes of establishing fibromyalgia as a medically determinable impairment.[62]  The ALJ also observed the record did not document "any positive tender points" (required under the 1990 criteria), "repeated manifestation of six or more fibromyalgia symptoms" (required under the 2010 criteria), or "a rule-out of other causes" (necessary under both sets of criteria).[63]  For these reasons, the ALJ found Ms. V.'s fibromyalgia was not medically determinable.[64]

Ms. V. argues the ALJ erred in finding Ms. Dahle was not an acceptable medical source for purposes of establishing fibromyalgia.[65]  As Ms. V. points out, agency regulations were revised in 2017 to expand the general definition of "acceptable medical source,"[66] and the revised definition includes a "Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments

---

[59] *Id.* at *3.

[60] *Id.* at *4.

[61] (Tr. 976.)

[62] (Tr. 996–97.)

[63] (Tr. 997); *see also* SSR 12-2p, 2012 SSR LEXIS 1, at *5–8.

[64] (Tr. 997.)

[65] (*See* Opening Br. 24–25, Doc. No. 19.)

[66] *See* 82 FR 5844 (Jan. 18, 2017).

within his or her licensed scope of practice."[67]  Ms. V. also cites the agency's Program

Operations Manual System ("POMS") guidance regarding SSR 12-2p, which states the

agency "plan[s] to revise relevant Social Security Rulings" to conform to the revised

definition of acceptable medical source.[68]  However, SSR 12-2p has not been revised to

expand the definition of acceptable medical source for purposes of establishing

fibromyalgia as a medically determinable impairment; the requirement that only a

licensed physician qualifies as an acceptable medical source for this purpose remains in

effect.[69]  Moreover, statements in POMS lack the force of law and create no judicially

enforceable rights.[70]  Accordingly, the ALJ properly found Ms. Dahle, as a nurse

practitioner, was not an acceptable medical source for purposes of establishing

fibromyalgia as a medically determinable impairment.

Ms. V. also cites medical records from various providers which she contends

cumulatively demonstrate she met the 1990 and 2010 criteria,[71] but she fails to identify

---

[67] 20 C.F.R. § 404.1502(a)(7); *see also* 82 FR 5844, *5846 (identifying nurse practitioners as one type of Advanced Practice Registered Nurse under the new definition).

[68] POMS DI 24515.076, https://secure.ssa.gov/apps10/poms.nsf/lnx/0424515076, [https://perma.cc/R8AS-HRQN].

[69] SSR 12-2p, 2012 SSR LEXIS 1, at *3; *see also Leticia B. v. King*, No. 24-116, 2025 U.S. Dist. LEXIS 13309, at *11 n.3 (D.N.M. Jan. 24, 2025) (unpublished) ("Only a licensed physician (a medical or osteopathic doctor) may provide evidence of a medically determinable impairment of fibromyalgia." (citing SSR 12-2p, 2012 SSR LEXIS 1)).

[70] *See Schweiker v. Hansen*, 450 U.S. 785, 789 (1981) ("[T]he Claims Manual is not a regulation.  It has no legal force, and it does not bind the SSA.").

[71] (*See* Opening Br. 25–26, Doc. No. 19.)

any diagnosis of fibromyalgia by a licensed physician in the record.[72]  Accordingly, the

ALJ did not err in finding Ms. V.'s fibromyalgia was not medically determinable.

B. Residual Functional Capacity

Ms. V. next challenges the ALJ's residual functional capacity assessment,

including her evaluation of medical opinions, consultative examination findings, and Ms.

V.'s exertional limitations.[73]

A claimant's residual functional capacity reflects the most she can do in a work

setting considering her limitations.[74]  In assessing residual functional capacity, the ALJ

considers "the extent to which an individual's medically determinable impairment(s),

including any related symptoms, such as pain, may cause physical or mental limitations

or restrictions that may affect his or her capacity to do work-related physical and mental

activities."[75]  The ALJ considers all relevant medical and other evidence in the record.[76]

---

[72] *See* SSR 12-2p, 2012 SSR LEXIS 1, at *3–4 (requiring a fibromyalgia diagnosis by a licensed physician in addition to evidence that the 1990 or 2010 criteria are met).

[73] (*See* Opening Br. 9–17, Doc. No. 19.)

[74] *See* 20 C.F.R. § 404.1545(a)(1); *see also* SSR 96-8p, 1996 SSR LEXIS 5, at *1–2 (July 2, 1996).

[75] SSR 96-8p, 1996 SSR LEXIS 5, at *5.

[76] *See* 20 C.F.R. § 404.1545(a)(3).

### 1. Medical Opinions and Consultative Examination Findings

Ms. V. asserts the ALJ improperly "dismissed" medical opinions from her treating nurse practitioner, Michelle Dahle; a state agency medical consultant, Dr. Gerald Rothstein; and a consultative physical examiner, Dr. Richard Ingebretsen.[77]

In determining a claimant's residual functional capacity, an ALJ must assess the persuasiveness of all medical opinion evidence based on the following factors: (1) supportability (the objective medical evidence and supporting explanations presented by the medical source); (2) the consistency of the opinion with other medical and nonmedical sources; (3) the relationship with the claimant (including its length, frequency, purpose, and extent—and whether it was an examining relationship); (4) any specialization; and (5) any other relevant factors.[78] The most important factors are supportability and consistency, and the ALJ is required to explain how she evaluated those two factors.[79]

As explained below, the ALJ properly evaluated medical opinions from Ms. Dahle and Dr. Gerard under this framework, and correctly determined Dr. Ingebretsen's report did not contain medical opinions as defined in agency regulations.

---

[77] (*See* Opening Br. 9–12, Doc. No. 19.)  In her opening brief, Ms. V. also discusses the findings of a psychological consultative examiner, Dr. Kathy Barnett, but she does not allege any error in the ALJ's consideration of Dr. Barnett's report.  (*See id.* at 27–28.)

[78] 20 C.F.R. § 404.1520c(b), (c)(1)–(5).

[79] *Id.* § 404.1520c(b)(2).

a.  Ms. Dahle

Ms. Dahle provided medical opinion statements in October 2018 and January 2020,[80] which the ALJ considered.[81]  In an October 2018 letter, Ms. Dahle opined Ms. V. could not stand for "extended amounts of time" or "greater than 30 minutes," could not "commit to work daily," and was "not currently able to work."[82]  In a January 2020 letter, Ms. Dahle stated she had diagnosed Ms. V. with fibromyalgia and opined Ms. V. could not "stand or sit for any length of time due to [] chronic severe pain."[83]  Ms. Dahle also filled out a check-box form in January 2020 indicating Ms. V. could stand/walk for less than two hours, sit for less than two hours, and must lie down for six hours in an eight-hour workday; could repetitively lift only ten pounds; could use her hands only occasionally; could not stoop, bend repeatedly, climb stairs, or crawl due to fibromyalgia; could not perform any basic mental work activities, and could not work due to fibromyalgia, hypertension, hernia, degenerative disc disease, vertigo, PTSD, and history of CVA.[84]

The ALJ found these opinions unpersuasive, concluding they lacked support and were inconsistent with both Ms. Dahle's own treatment records and the overall record.[85]  And the ALJ provided detailed reasons for her supportability and consistency findings.

---

[80] (Tr. 665, 876–78, 941–42 (duplicate of Tr. 877–78), 1665 (duplicate of Tr. 665).)

[81] (Tr. 1010–11.)

[82] (Tr. 665.)

[83] (Tr. 876.)

[84] (Tr. 877–78.)

[85] (Tr. 1010–11.)

For example, the ALJ noted Ms. Dahle's opinions were based in part on Ms. V.'s fibromyalgia and stroke history, but the record lacked the evidence necessary to establish these conditions as medically determinable impairments.[86]  The ALJ also determined Ms. Dahle's opinions were inconsistent with records from her own examinations of Ms. V., which contained normal neurologic, sensory, and motor findings.[87]  And the ALJ observed "Ms. Dahle's impression of the claimant's clinical presentation has differed from other treatment providers, with Ms. Dahle finding that the claimant's symptoms and limitations have been more significant."[88]

Other than arguing Ms. Dahle was an acceptable medical source to diagnose fibromyalgia (which is incorrect, as explained above), Ms. V. fails to develop any argument as to how the ALJ erred in her evaluation of Ms. Dahle's opinions.  As described above, the ALJ applied the correct legal standards in evaluating these opinions, and the evidence cited by the ALJ is sufficient to support her findings regarding supportability and consistency.  Accordingly, Ms. V. has demonstrated no error in the ALJ's assessment of Ms. Dahle's opinions.

    b.    Dr. Rothstein

Dr. Rothstein, a state agency medical consultant, reviewed the record in January 2019 (on reconsideration of the initial denial of Ms. V.'s claim) and opined Ms. V. could perform "light" work; could never climb ladders, ropes, or scaffolds; and frequently

---

[86] (*Id.*)

[87] (Tr. 1011 (citing Tr. 887).)

[88] (*Id.* (citing Tr. 603–08 (4/13/2018 consultative examination by Dr. Ingebretsen), Tr. 667 (10/30/2018 progress note from Ms. Dahle), Tr. 709 (11/6/2018 progress note from Craig Yerke, PA).)

stoop, kneel, crouch, crawl, and climb ramps/stairs; and had manipulative limitations in her left hand.[89]  The ALJ found Dr. Rothstein's opinion persuasive except as to the manipulative limitations.[90]  The ALJ noted Dr. Rothstein cited Ms. V.'s history of CVA (stroke) to support the manipulative limitations, but the ALJ reiterated CVA "is not established in the medical evidence."[91]  Accordingly, the ALJ found "there is no support for the CVA to justify [manipulative] limitations."[92]  Otherwise, the ALJ found Dr. Rothstein's opinions contained "adequate support" and were "more consistent with the evidence received at the hearing level, including the claimant's subjective reports," than the prior state agency opinion of Dr. Kim Heaton (who opined Ms. V. was capable of "medium" work).[93]

Ms. V. suggests the ALJ improperly "[d]ismissed . . . Dr. Rothstein (who opined manipulative limitations),"[94] but she does not further develop this argument in her opening brief.  Because the ALJ rejected only the manipulative limitations (and otherwise found Dr. Rothstein's opinions persuasive), the court construes Ms. V.'s argument as challenging only this portion of the ALJ's assessment.

---

[89] (Tr. 179–99.)

[90] (Tr. 1013.)

[91] (*Id.*; *see also* Tr. 195 (stating "Post-CVA" as the basis for the opined manipulative limitations).)

[92] (Tr. 1013.)

[93] (*Id.*)

[94] (Opening Br. 9, Doc. No. 19.)

The ALJ did not err in rejecting Dr. Rothstein's opinion regarding manipulative limitations. As explained above, the ALJ appropriately found Ms. V.'s history of stroke/CVA was not medically determinable due to a lack of evidence in the record that Ms. V. had experienced a stroke. And the ALJ was only required to consider Ms. V.'s medically determinable impairments in assessing her residual functional capacity.[95] Where Dr. Rothstein's only stated basis for recommending manipulative limitations was Ms. V.'s stroke history, and the stroke history was not medically determinable, the ALJ did not err in finding the manipulative limitations unsupported.

In her reply, Ms. V. asserts Dr. Rothstein provided an additional explanation for the opined manipulative limitations, apart from her stroke history.[96] Ms. V. points to the statement at the bottom of Dr. Rothstein's form, under the heading "RFC – Additional Explanation," that "[b]ased on [medical evidence of record], additional limitations in manipulation, left hand and postural limitation are included."[97] But read in context, this statement merely summarizes the differences between Dr. Rothstein's residual functional capacity opinion and the earlier assessment by Dr. Heaton. This summary statement provides no explanation regarding what medical evidence supported the additional manipulative limitations. As noted, on the section of the form specifically inviting an explanation for the manipulative limitations, Dr. Rothstein merely stated

---

[95] *See* 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' . . . when we assess your residual functional capacity.").

[96] (*See* Reply Br. 7–8, Doc. No. 31.)

[97] (Tr. 195–96.)

"Post-CVA."[98]  Accordingly, the ALJ did not err in treating this as Dr. Rothstein's only stated basis for the opined manipulative limitations—nor did she err by rejecting such limitations where Ms. V.'s stroke history was not medically determinable.

        c.    <u>Dr. Ingebretsen</u>

Ms. V. next challenges the ALJ's evaluation of Dr. Ingebretsen's consultative examination report from April 2018.[99]  The ALJ described Dr. Ingebretsen's report as "diagnostic in nature," and noted "he did not provide an opinion regarding the claimant's ability to perform work-related physical activities."[100]  As a result, the ALJ concluded there was no "medical opinion" to assess.[101]  Even so, the ALJ found Ms. V.'s "presentation and reports at this evaluation [were] not well supported [by] the overall record, including no evidence to support a history of stroke, or a diagnosis of osteoarthritis in her hands, with no imaging."[102]

The ALJ's assessment is consistent with agency regulations, which define "medical opinion" narrowly as "a statement from a medical source about what [the claimant] can still do despite [the claimant's] impairment(s) and whether [the claimant has] one or more impairment-related limitations or restrictions" in certain enumerated work-related abilities.[103]  Indeed, Ms. V. fails to identify any portion of the report which

---

[98] (Tr. 195.)

[99] (*See* Opening Br. 9–10, 13–15, Doc. No. 19.)

[100] (Tr. 1013.)

[101] (*Id.*)

[102] (*Id.*)

[103] 20 C.F.R. § 404.1513(a)(2).

could qualify as a medical opinion under this definition.  Accordingly, the ALJ was not required to evaluate the persuasiveness of the report or articulate findings regarding supportability and consistency.  Still, Ms. V. asserts the ALJ improperly ignored Dr. Ingebretsen's observations and findings.[104]

Contrary to Ms. V.'s argument, the ALJ extensively discussed Dr. Ingebretsen's examination in her decision, citing his report eighteen times.[105]  For example, the ALJ referred to the symptoms, limitations, and daily activities Ms. V. reported to Dr. Ingebretsen.[106]  The ALJ also discussed Dr. Ingebretsen's exam findings and observations, noting Ms. V. had a negative straight leg raise, presented without a walker, and could use her hands for fine and gross tasks.[107]  But the ALJ did not merely cite portions of the report favorable to her conclusions: she also acknowledged Ms. V. "demonstrated left-sided weakness and slower motor response" during Dr. Ingebretsen's exam (but noted Ms. V. demonstrated decreased strength in her *right* leg during an orthopedist exam seven months later).[108]  Finally, despite concluding the report contained no medical opinions, the ALJ still articulated a finding that Ms. V.'s

---

[104] (Opening Br. 13–14, Doc. No. 19.)

[105] (*See* Tr. 995–96, 998–99, 1002–05, 1008, 1011.)  Dr. Ingebretsen's report is cited in the ALJ's decision as "Ex. 9F."

[106] (*See* Tr. 997 (noting Ms. V. alleged vertigo and back, neck, and hand pain following a stroke; alleged blindness; and alleged she had stropped driving (citing Tr. 603–04)); Tr. 998–99 (noting Ms. V. reported she watched TV and read a lot, and continued to translate for people (citing Tr. 604)).)

[107] (Tr. 1002–03 (citing Tr. 604–06).)

[108] (Tr. 1004 (citing Tr. 603, 606, 709)); *cf. Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004) ("It is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence.").

reports and presentation during the exam were "not well supported" by the medical record.[109]  The record shows the ALJ adequately considered Dr. Ingebretsen's report.[110]

### 2. Exertional Limitations

Ms. V. next contends the ALJ erred by failing to adequately account for her walking limitations in the residual functional capacity assessment.[111]  Specifically, Ms. V. argues the evidence does not support the ALJ's finding that she is capable of the full exertional range of light work.[112]

An ALJ must evaluate a claimant's self-reported symptoms using a two-step process.  First, she "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain."[113]  Second, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities."[114]  In doing so, the ALJ must "examine the entire case record."[115]  The ALJ considers factors such as:

---

[109] (Tr. 1013.)

[110] See Clifton v. Chater, 79 F.3d 1007, 1009–10 (10th Cir. 1996) ("The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.").

[111] (See Opening Br. 10, 13–17, Doc. No. 19.)

[112] (See id. at 17.)

[113] SSR 16-3p, 2016 SSR LEXIS 4, at *3 (Oct. 25, 2017); see also 20 C.F.R. § 404.1529(b).

[114] SSR 16-3p, 2016 SSR LEXIS 4, at *4; see also 20 C.F.R. § 404.1529(c).

[115] SSR 16-3p, 2016 SSR LEXIS 4, at *9–10; see also 20 C.F.R. § 404.1529(c).

the claimant's daily activities; the duration, frequency, and intensity of symptoms; medication taken and whether it alleviates the symptoms; and other treatment or measures used to relieve the symptoms.[116]  The ALJ also considers any inconsistences between the claimant's statements and the rest of the evidence (including the claimant's history, medical signs and laboratory findings, and statements by medical sources and others).[117]

Here, the ALJ considered Ms. V.'s reported difficulty "lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, [and] stair climbing," as well as Ms. V.'s testimony that she could not work due to low back pain, leg swelling, and her use of a walker.[118]  The ALJ followed the two-step process set forth above, finding Ms. V.'s medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Ms. V.'s statements regarding the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the record evidence.[119]  The ALJ found the medical evidence showed Ms. V. received "limited specialized treatment," "engaged in treatment for the purposes of obtaining disability," "demonstrated no more than moderate functional deficits," and "reported and presented with multiple inconsistencies."[120]

---

[116] SSR 16-3p, 2016 SSR LEXIS 4, at *18–19; *see also* 20 C.F.R. § 404.1529(c)(3).

[117] 20 C.F.R. § 404.1529(c)(4).

[118] (Tr. 1001.)

[119] (*Id.*)

[120] (*Id.*)

The ALJ first addressed the objective medical evidence, referring to MRIs showing Ms. V. had degenerative disc disease in her cervical and lumbar spine.[121]  But the ALJ noted that despite these findings, Ms. V. demonstrated a negative straight leg raise in the April 2018 consultative examination.[122]  While the ALJ acknowledged "some clinical findings of reduced range of motion" in Ms. V.'s cervical spine and lumbar spine from a 2017 treatment visit and the April 2018 consultative examination, she noted there were "no consistent findings of such deficits."[123]  Further, at an April 2019 examination by her cardiologist, Ms. V. demonstrated normal motor strength, full range of motion, and had no edema.[124]  The ALJ also considered Ms. V.'s report to her primary care provider in October 2018 that she needed neck and back surgery, but noted the record contained no documentation showing any provider had recommended surgery.[125]

With respect to walking limitations, the ALJ found the record did not support Ms. V.'s allegation that she was dependent on a walker.[126]  The ALJ acknowledged Dr. Ingebretsen and a mental health provider observed an unstable gait in April 2018 and March 2019, but Ms. V. did not use a walker during those visits.[127]  Further, the ALJ noted Ms. V. denied gait abnormality in June 2017, and other providers and the

---

[121] (*Id.*)

[122] (Tr. 1002 (citing Tr. 606).)

[123] (Tr. 1006 (citing Tr. 418–23).)

[124] (Tr. 1002–03, 1006 (citing Tr. 1657–59).)

[125] (Tr. 1003 (citing Tr. 672).)

[126] (Tr. 1002, 1005–06.)

[127] (Tr. 1002 (citing Tr. 604–05, 818).)

psychological consultative examiner observed a normal/coordinated gait in April 2018, December 2018, and April 2019.[128]

The ALJ concluded the overall record reflected "good, stable findings on exam, from a motor, sensory, and reflex standpoint," and no examination findings supported Ms. V.'s statements regarding "an inability to sit, stand, or walk for more than minimal periods, or lift more than a few pounds."[129]  The ALJ also noted Ms. V.'s symptoms had been treated conservatively with medication, and Ms. V. "fail[ed] to follow through with recommendations for physical therapy, or return for any other treatment modalities, such as injections, massage, etc."[130]  Based on these findings, the ALJ determined Ms. V. was capable of "light" work.[131]

Ms. V. has demonstrated no error in the ALJ's assessment of her exertional limitations.  Substantial evidence supports the ALJ's findings regarding these limitations, including the medical records cited in the decision and summarized above.  These findings are also supported by Dr. Rothstein's opinion (which the ALJ found persuasive) that Ms. V. could perform at a "light" exertional level.[132]  This evidence qualifies as substantial evidence (more than a "mere scintilla"[133]) supporting the ALJ's findings.

---

[128] (*Id.* (citing Tr. 519, 612, 614, 784, 810).)

[129] (Tr. 1006.)

[130] (*Id.*)

[131] (Tr. 1006–07.)

[132] (*See* Tr. 179–99, 1013.)

[133] *Biestek*, 587 U.S. at 103.

Although Ms. V. asserts the record supports a finding of finding of greater exertional limitations, she fails to show the ALJ erred.  First, Ms. V. argues the MRIs showed "deterioration," but she does not explain how this undermines the ALJ's findings regarding her exertional limitations.[134]  As noted, the ALJ considered the MRIs and acknowledged they showed degenerative changes.[135]  Next, Ms. V. argues her "slow" gait has been observed by "various medical sources."[136]  But again, the ALJ acknowledged the record contained mixed observations regarding Ms. V.'s gait.[137]  Although Ms. V. cites some additional records of abnormal gait, not specifically referenced by the ALJ,[138] the ALJ was not required to discuss every piece of evidence.[139]  Moreover, Ms. V. does not dispute that many other records showed a normal gait, as the ALJ noted.[140]  The record demonstrates the ALJ adequately considered the mixed medical evidence regarding Ms. V.'s gait, and permissibly

---

[134] (Opening Br. 12–13, 17, Doc. No. 19.)

[135] (Tr. 1001.)

[136] (Opening Br. 16, Doc. No. 19 (citing Tr. 420, 792, 818, 838, 846, 862, 1458, 1475)).)

[137] (*See* Tr. 1002.)

[138] (*See* Tr. 420, 838, 846, 862, 1458, 1475.)

[139] *See Clifton*, 79 F.3d at 1009–10.

[140] (*See* Opening Br. 16 n.68, Doc. No. 19.)

concluded Ms. V. was not as limited as she alleged.[141]  At bottom, Ms. V.'s arguments are merely an invitation to reweigh the evidence.[142]

Ms. V. also argues her asserted need for a walker was not inconsistent with the medical evidence.[143]  Ms. V. claims she only said that she needed a walker at home and for long distances, which was not inconsistent with attending appointments without a walker.[144]  But Ms. V. testified at the hearing that she could not "walk without [a] walker" and used it "nonstop."[145]  The ALJ did not err in finding these statements unsupported where Ms. V. attended numerous medical appointments without a walker and was often observed to have normal gait.

Finally, Ms. V. suggests the ALJ improperly relied on a Cooperative Disability Investigations[146] ("CDI") report in discounting Ms. V.'s allegations.[147]  The CDI investigator observed Ms. V. driving and walking from her driveway to her house without a walker.[148]  The ALJ primarily relied on the CDI report in support of the mental residual functional capacity assessment (which Ms. V. does not challenge), but also noted it

---

[141] *See Lax*, 489 F.3d at 1084 ("The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." (citation omitted)).

[142] *See Langley*, 373 F.3d at 1118.

[143] (*See* Opening Br. 17, Doc. No. 19.)

[144] (*Id.*)

[145] (Tr. 1275–76.)

[146] The Cooperative Disability Investigations program investigates reports of social security fraud.  *See* https://oig.ssa.gov/cdi/ [https://perma.cc/SCS3-7868].

[147] (*See* Opening Br. 28–29, Doc. No. 19.)

[148] (*See* Tr. 661–62.)

undermined Ms. V.'s assertions that she could not drive and needed a walker.[149]  Ms. V. suggests the ALJ should not have relied on the report because she was not criminally indicted for fraud.[150]  But Ms. V. neglects to cite any authority for the proposition that an ALJ cannot rely on evidence from a CDI investigation unless it results in a criminal indictment.  Ms. V. has not shown the ALJ erred in relying on the investigator's observations or considering evidence from the CDI investigation.

Because the ALJ's findings are supported by substantial evidence, Ms. V. has demonstrated no error in the ALJ's assessment of her exertional limitations.

## CONCLUSION

The Commissioner's decision is affirmed.

DATED this 5th day of March, 2025.

BY THE COURT:

Daphne A. Oberg
United States Magistrate Judge

---

[149] (*See* Tr. 999, 1005, 1007–08.)

[150] (*See* Opening Br. 29, Doc. No. 19.)